J-A30014-16
J-A30015-16

2017 PA Super 159

| | | |
|---|---|---|
| G. MICHELLE KROLCZYK | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | | |
| v. | | |
| GODDARD SYSTEMS, INC.; NICOLE WISHARD, T/A THE GODDARD SCHOOL OF HARRISBURG; GODDARD SCHOOL; FLH, INC. | | |
| | | No. 533 MDA 2016 |

Appeal from the Order Entered March 3, 2016
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): 2008 CV 11907

| | | |
|---|---|---|
| LYDIA DICOLA | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | | |
| v. | | |
| GODDARD SYSTEMS, INC., NICOLE WISHARD, T/A GODDARD SCHOOL OF HARRISBURG, THE GODDARD SCHOOL, A FICTITIOUS NAME, AND FLH, INC. | | |
| | | No. 534 MDA 2016 |

Appeal from the Order Entered March 3, 2016
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): 2008 CV 12139-CV

BEFORE:  BOWES, OLSON AND STABILE, JJ.

OPINION BY BOWES, J.:                    **FILED MAY 23, 2017**

G. Michelle Krolczyk and Lydia DiCola ("Plaintiffs"), who instituted these wrongful discharge/defamation lawsuits, appeal from the March 3, 2016 order entering summary judgment in favor of Goddard Systems, Inc., Nicole Wishard, t/a the Goddard School of Harrisburg, the Goddard School, a fictitious name (collectively "Goddard"), and FLH, Inc., which is the franchisor of Goddard (collectively "Defendants"). We reverse the decision dismissing their wrongful discharge cause of action, but affirm the grant of summary judgment as to the defamation claim.

Ms. Wishard owned and operated Goddard, a private school, and was the president of FLH, Inc. Ms. Krolczyk is a state certified pre-school educator through the academic board of private schools in Pennsylvania. Ms. DiCola is a Florida and Texas certified early childhood education teacher. We have consolidated the cases for purposes of appellate review as they were instituted based upon the same series of events, which occurred when Plaintiffs were co-instructors in a classroom at Goddard.

In late 2007 and early 2008, Plaintiffs were working as pre-school teachers for Goddard co-instructing children aged three and four in a classroom known as the Junior Genius classroom. Ms. Wishard dismissed both women on February 14, 2008, and, the following day, a letter was disseminated to their students' parents regarding their termination. In their lawsuits, Plaintiffs alleged that they were wrongfully discharged after informing Ms. Wishard that they were going to report, as required by

- 2 -

Pennsylvania law, that they suspected that one of their students, A.G., was being abused or neglected. They averred that the letter given to the parents was defamatory. Their cases were dismissed based upon the grant of summary judgment.

The record indicates the following. A.G., a student in the Junior Genius classroom, was four years old when the pertinent events transpired. A.G.'s mother was Jennifer G., who was the Director of Education for Goddard and who supervised Plaintiffs. A.G. was developmentally delayed and extremely aggressive. Plaintiffs delineated that, during the waning months of 2007, A.G. engaged in the following behavior in their classroom: 1) called the teachers and other students profane names; 2) repeatedly threatened to shoot and kill or to stab the teachers and other students; 3) on numerous occasions, physically assaulted and threw objects at teachers as well as other students; 4) bit Plaintiffs and their co-workers with sufficient force to break the skin and leave welts and bruises; 5) otherwise terrorized students to such an extent that those students no longer wanted to attend Goddard; 6) continually defecated on himself and resisted efforts to clean up the feces; and 7) physically and verbally prevented the teachers from instructing any of their students. Based upon A.G.'s conduct, Plaintiffs suspected that he was being either neglected or abused. Jennifer G. admitted that her son's chronic bowel incontinence and hyper-aggression supported Plaintiffs' suspicion that he was being abused or neglected. Specifically, Jennifer G.

conceded that "late stage potty training and inappropriate aggression" were "indicators" of a "possibility of abuse" and that her son A.G. had both of these "red flags." Deposition of Jennifer G., 4/13/11, at 78.

Prior to December 2007, Plaintiffs sought help with A.G. from Ms. Wishard, suggesting that intervention from a state agency might be appropriate. Ms. Wishard failed to undertake any affirmative action, and instead, directed Plaintiffs neither to contact any child welfare agency nor to report that they suspected that A.G. was being abused or neglected. Since the above-delineated inappropriate behavior neither abated nor was addressed, in December 2007, Plaintiffs began to keep a daily journal to document A.G.'s conduct and their efforts to redirect his aggressive behavior. The journal indicated the following. A.G. urinated and/or defecated himself December 4th, December 5th, December 14th, December 17th, and, following the holiday break, on January 7th, January 9th, January 10th, January 11th, January 14th, January 16th, January 23rd, January 25th, January 29th, January 31st, February 4th, and February 6th, 2008. On many of these occasions, A.G. defecated in his pants more than once.

On December 5th, A.G. threatened violence against children and adults and was very disruptive. On December 14th, he tormented and physically harassed a classmate, and on December 17th, he threw wooden blocks at a sleeping child. On that occasion, A.G. was restrained in the presence of Jennifer G., who immediately removed A.G. from the classroom. On January

8th, A.G. kicked, scratched, and tried to bite Ms. Krolczyk several times and informed her that he was "going to get a machine gun and load it with bullets and blow her head off." Deposition of Jennifer G., 4/13/11 at Exhibit D-12 (the "Journal") at 368. He also threw his shoes at her and said that he was going to break her nose. The following day, A.G. again threatened to kill Ms. Krolczyk as well as another student, and punched and scratched Ms. Krolczyk on the face. A.G. also pulled Ms. DiCola's hair and kicked her. He was restrained on this occasion.

On January 11th, A.G. struck a child with a toy, and was again restrained; Ms. Krolczyk told Jennifer G. about this incident. On January 22nd, A.G. threw his shoes at Ms. Krolczyk and called her profane names. On January 23rd, A.G.'s father dragged him from the classroom as A.G. was crying. On January 25th, A.G. called Ms. Krolczyk profane names and told Ms. DiCola, who was pregnant, that he was going to take a knife and remove her baby and that his father was going to kill her with his gun. He also informed Ms. Krolczyk that he was going to kill the police so they could not "get his Mom." Journal at 384.

On January 28th, A.G. broke the toilet seat, threw water on the bathroom floor, and began to roll around. On February 4th, A.G. bit Ms. Krolczyk in her forearm, leaving a mark. On the morning of February 5th, A.G. began to scream and flail his arms, and, when Ms. Krolczyk carried him from the room, he buried his teeth in her forearm. He also bit her later that

afternoon. On February 6th, A.G. threatened students and teachers with physical violence, screamed, and would not follow directions.

Thursday, February 7, 2008, was A.G.'s last day under Plaintiffs' supervision. A.G. began the day by continually defecating in his pants. Since his hostile behavior began to escalate, another employee at Goddard, Ms. Angie, whose last name is not revealed in the record, offered to help to control him. During naptime, A.G. repeatedly refused to lie down and be quiet. He was playing with a toy, and each time A.G. engaged in disruptive behavior, Ms. Krolczyk told him that she would take it away from him. As A.G. persisted in his actions, the toy was removed. A.G. immediately began to act out inappropriately. Ms. Angie held down his feet, and Ms. Krolczyk restrained him by hugging him. Journal at 408. Becoming more agitated, A.G. attempted to bite Ms. Krolczyk, and, when Ms. DiCola intervened, he bit her forearm and refused to release his teeth from her flesh, which began to bleed.

The journal continued that Ms. DiCola "attempted to activate the reflex of tilting your head back by gently pressing on the nerve cluster underneath his nose, against his lip to force him to release his bite." Journal at 409. A.G. was not affected by this action, and Ms. Angie and Ms. Krolczyk "helped break his grip" on Ms. DiCola's arm. *Id*. All three women, Ms. Angie, Ms. Krolczyk, and Ms. DiCola, held A.G. in order to calm him down. The journal delineated that, during this episode, A.G. was "completely out of control,"

and appeared to be in a "full-blown, adrenaline-fueled rage" and "out of his mind and body." *Id*. Eventually, the three women quieted A.G. and laid him down on his mat next to the sleeping children. Five minutes later, Jennifer G. came into the classroom and was told about the incident. She listened and nodded and then left with A.G., who did not return to school the following day.

On Monday, February 11, 2008, Plaintiffs gave Ms. Wishard their journal. Deposition of Lydia DiCola, 5/8/13, at 63. Since A.G.'s behavior gave rise to a suspicion by Plaintiffs that he was being abused or neglected, on February 13, 2008, Ms. Krolczyk called the hotline of the Pennsylvania Department of Education and asked how she and Ms. DiCola should proceed to report their suspicion of abuse or neglect. Plaintiffs were instructed to meet with Ms. Wishard and inform her about their shared suspicion of abuse or neglect. They were also told that they should report their suspicion of abuse or neglect by filing a formal report of suspected child abuse with the local department of the Pennsylvania Department of Public Welfare.

On February 14, 2008, Plaintiffs met with Ms. Wishard and informed her that A.G.'s behavior was indicative that he was being abused or neglected at home. They also notified Ms. Wishard that they had contacted the Department of Education, and they conveyed to Ms. Wishard that they intended to formally report to the Department of Public Welfare that they

suspected there was abuse or neglect in A.G.'s home. Plaintiffs were mandated reporters of suspected abuse under Pennsylvania law.

Within hours of the February 14, 2008 meeting, Ms. Wishard called Plaintiffs at home and said that they were fired. Ms. Krolczyk testified that Ms. Wishard informed her that she was being discharged, "Based on the conversation we had this afternoon and your decision [*i.e.*, to report suspected abuse or neglect of A.G.], that your services are just no longer needed here, we'll call today your last day and go our separate ways." Deposition of G. Michelle Krolczyk, 5/8/13, at 150. Ms. Wishard thereafter sent a letter to the parents delineating that Plaintiffs were terminated "for various reasons" but Ms. Wishard assured them "that protecting both the children's interest as well as the parents' interest as well as the good of this school are the deciding factors for my decision." Deposition of Jennifer G., 4/13/11, at Exhibit I.

During her deposition, Ms. Wishard claimed that Plaintiffs were dismissed for having "inappropriate contact with a student" by restraining A.G. Deposition of Nicole Wishard, 6/2/10, at 40, 51. She relied specifically on the February 7, 2008 incident, as described in the journal, when A.G. was hugged by Ms. Krolczyk, Ms. DiCola had applied pressure to A.G.'s upper lip, Ms. Krolczyk and Ms. Angie had removed his teeth from Ms. DiCola's bleeding arm, and all three women held him in order to calm him down.

Ms. Wishard admitted that the journal indicated that Plaintiffs restrained A.G. "in order to prevent him from hurting himself, a teacher, or another child" and that there was no indication that Plaintiffs physically abused A.G. in any manner by hitting, beating, or kicking him. *Id*. Ms. Wishard also acknowledged that the journal indicated that Ms. Angie was involved in restraining A.G., but that she was not discharged, ostensibly because Ms. Wishard interviewed Ms. Angie and Ms. Angie denied restraining A.G. While Ms. Wishard asserted that she would fire any teacher who restrained a student, cross-examination indicated that there were other instances of restraint where teachers were not fired. When deposed, Jennifer G. acknowledged that another teacher, J.S., had not been terminated even though she pinched a child's forearm. Deposition of Jennifer G., 4/13/11, at 23-24. Indeed, Jennifer G. herself restrained a child and was not dismissed. *Id*. at 52.

After discovery was conducted, Defendants filed a motion for summary judgment. They asserted that Plaintiffs' wrongful discharge claims were not viable because Plaintiffs were fired for a valid, legitimate, and non-prohibited reason, as outlined in Ms. Wishard's deposition, *i.e.*, they restrained A.G. in violation of school policy. Defendants also averred that the letter was not defamatory. The trial court granted summary judgment on the wrongful discharge claims by finding that, in accordance with the testimonial deposition of Ms. Wishard, Defendants had offered a "separate, plausible and

legitimate reason" for the terminations. Trial Court Opinion, 3/3/16, at (unnumbered page) 5. It rejected the position that the reason was pre-textual.[1] In concluding that Defendants "proffered a legitimate nondiscriminatory reason for terminating Plaintiff[s'] employment, the court ruled that Plaintiffs were dismissed solely because they "had been physically restraining a four-year-old boy for several months[.]" *Id*. at (unnumbered page) 6. In dismissing the defamation count, the trial court noted that Plaintiffs had not incurred special harm and apparently decided that the letter sent to parents was not defamatory *per se*. *Id*. at (unnumbered page) 9 ("A fair reading of this letter shows that it is not fairly calculated to harass Plaintiff[s'] reputation.").

In this appeal from the grant of summary judgment, Plaintiffs raise these averments:

A. Did the lower court err in dismissing Appellant[s'] claim[s] for wrongful termination when there were material issues of fact vital to the adjudication of said claims, including, but not limited to, a temporal proximity between the protected activity (i.e., reporting suspected abuse) and the adverse job action (i.e., termination) which could be measured in minutes and/or hours, as well as material issues of fact which could establish that the asserted "legitimate" basis for termination was, in fact, a post-hoc pretext?

---

[1] For inexplicable reasons, in deciding that Defendants offered a legitimate, non-pretextual reason for firing Plaintiffs, the trial court relied upon federal law disseminated in the area of age, race, or sex discrimination rather than the rules applicable to grant of summary judgment in Pennsylvania.

B. Did the lower court err, as a matter of law, when it violated the Nanty-Glo rule in entering judgment against Appellant[s] on the basis of the Appellee[s'] own deposition testimony concerning the facts and circumstances giving rise to Appellee[s'] decision to terminate Appellant[s'] employment?

C. Did the lower court erred [sic] in entering judgment against Appellant[s'] "defamation" claim[s] when the facts of the case establish that Appellees published a false and misleading letter which adversely affected Appellant[s'] ability to obtain employment in [their] chosen f[ield]?

Appellants' briefs at 2.

We first set forth the principles applicable to grant of summary judgment in Pennsylvania. As we observed in **Nationwide Mut. Fire Ins. Co. v. Modern Gas**, 143 A.3d 412, 415 (Pa.Super. 2016) (quoting **Atcovitz v. Gulph Mills Tennis Club, Inc.**, 812 A.2d 1218, 1221 (Pa. 2002)), our Supreme Court has often admonished that "summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." **See** Pa.R.C.P. 1035.2(1). Moreover, when any court considers a motion for summary judgment, it is required to accept all the facts of record as well as the reasonable inferences from those facts in favor of the non-moving party. **Nationwide**, **supra**. Additionally, the trial court "must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only

grant summary judgment where the right to such judgment is clear and free from all doubt." *Id*. at 415 (citation and quotation marks omitted).

As the appellate court, we are permitted to "reverse a grant of summary judgment if there has been an error of law or an abuse of discretion." *Id*. Since the question of "whether there are no genuine issues as to any material fact presents a question of law," we engage in a standard of review that is *de novo*, and are not required to "defer to the determinations made by the lower tribunals." *Id*. "If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied." *Id*.

We will address together Plaintiffs' first two claims, which pertain to the grant of summary judgment as to the wrongful discharge causes of action. It is evident herein that, in resolving the motion for summary judgment as to wrongful discharge, the trial court did not view the facts in the light most favorable to Plaintiffs, and, instead, accepted the version of the facts proffered by Defendants. As more fully delineated *infra*, the trial court also violated the well-established *Nanty-Glo* rule.

We first examine whether Plaintiffs have a viable wrongful discharge cause of action. In Pennsylvania, absent an express agreement, there is a presumption that any employment relationship is at-will, and thus can be "terminated by either party at any time, for any reason or for no reason." *Wakeley v. M.J. Brunner, Inc.*, 147 A.3d 1, 5 (Pa.Super. 2016) (citation

omitted). In the seminal decision in **Geary v. United States Steel Corp.***,* 319 A.2d 174 (Pa. 1974), our Supreme Court articulated that there is a common law wrongful discharge cause of action in Pennsylvania for an at-will employee if the employee's firing violated public policy. However, the Court concluded that no public policy was implicated in Geary's termination.

Subsequently, in **Shick v. Shirey**, 716 A.2d 1231 (Pa. 1998), the Supreme Court first announced a public policy exception to the at-will employment doctrine. Therein, the Court held that, in Pennsylvania, an at-will employee asserts a viable common law cause of action for wrongful discharge when the employee maintains that he was fired because he exercised his statutory right to file a workers' compensation claim. Our High Court ruled that the lawsuit could be brought since terminating an employee for exercising his or her legal right to workers' compensation violated Pennsylvania public policy. **See also Rothrock v. Rothrock Motor Sales, Inc.**, 883 A.2d 511 (2005) (holding that it violates public policy for a father to be dismissed for failing to prevent his son from obtaining workers' compensation benefits); **Highhouse v. Avery Transportation***,* 660 A.2d 1374 (Pa.Super. 1995) (concluding that an employee was wrongfully discharged after filing an unemployment compensation claim); **Reuther v. Fowler & Williams, Inc.***,* 386 A.2d 119 (Pa.Super. 1978) (ruling that a cause of action for wrongful discharge was present where employee claimed that he was fired for performing jury duty).

The decision announced in **Field v. Philadelphia Elec. Co.**, 565 A.2d 1170 (Pa.Super. 1989), is dispositive. Therein, plaintiffs, who were at-will employees, filed an action against their employer raising, *inter alia*, a wrongful discharge cause of action. We concluded that the cause of action survived a demurrer since plaintiffs had set forth that their dismissals were a violation of a recognized public policy. In **Field**, the employees maintained that they were fired because one of them reported a violation of federal law to the federal agency charged with oversight of the matter. They additionally averred that the reporter was statutorily-required to report the employer's violation of the applicable federal law.

Since the employees alleged that they were all terminated because one of them "performed a duty he was required to perform under federal law," the **Field** Court ruled that they had stated a claim for wrongful discharge. **Id**. at 1180. We observed that the federal law in question was "designed to protect the health and safety of the public" and that the employee's action of reporting the employer's violation of the federal mandates "directly advanced the public concerns addressed" by the statute in question. **Id**.

In this case, Plaintiffs were mandated reporters of suspected child abuse under 23 Pa.C.S. § 6311(a). Section 6311, which is entitled "mandated reporters," provides: "The following adults shall make a report of suspected child abuse, subject to subsection (b), if the person has

reasonable cause to suspect that a child is a victim of child abuse: . . . [a] school employee [or a]n employee of a child-care service who has direct contact with children in the course of employment."  23 Pa.C.S. § 6311 (a)(4), (5).  Subsection (b), basis to report, also applies herein:

> (1) A mandated reporter enumerated in subsection (a) shall make a report of suspected child abuse in accordance with section 6313 (relating to reporting procedure), if the mandated reporter has reasonable cause to suspect that a child is a victim of child abuse under any of the following circumstances:
>
>> (i) The mandated reporter comes into contact with the child in the course of employment, occupation and practice of a profession or through a regularly scheduled program, activity or service.
>>
>> (ii) The mandated reporter is directly responsible for the care, supervision, guidance or training of the child, or is affiliated with an agency, institution, organization, school, regularly established church or religious organization or other entity that is directly responsible for the care, supervision, guidance or training of the child.

23 Pa.C.S. § 6311.

Plaintiffs pled and presented sufficient proof that A.G.'s behavioral issues caused them to suspect that he was a victim of abuse or neglect. They articulated that they believed that A.G.'s problems with soiling himself and physically hostile behavior indicated that he may have been neglected or abused.   Plaintiffs also testified that they contacted the Department of Education, which confirmed that these behaviors were indicators of suspected child abuse or neglect.  Finally, Jennifer G. admitted that her son's

hyper-aggressive behavior and bowel movements in his clothing were red flags for possible child abuse or neglect.

Thus, Plaintiffs adduced sufficient proof to establish that they were required, under Pennsylvania law, to report their suspicion that A.G. was being neglected or abused. They also presented testimonial and circumstantial evidence to support their position that they were discharged solely because they planned to report, as required by the statute, that they suspected that there was abuse or neglect in A.G.'s home. The most crucial aspect of Plaintiffs' proof about the reason for the terminations came from Ms. Krolczyk's testimony, which we are required to credit under the standards applicable to summary judgment. Ms. Krolczyk's deposition indicated that Ms. Wishard informed Ms. Krolczyk that she was being dismissed, "Based on the conversation we had this afternoon and your decision [*i.e.*, to report suspected abuse or neglect of A.G.], that your services are just no longer needed here, we'll call today your last day and go our separate ways." Deposition of G. Michelle Krolczyk, 5/8/13, at 150. This proof, standing alone, prevents the grant of summary judgment in favor of Defendants.

However, there was additional, circumstantial evidence that Plaintiffs were not fired for the reason proffered by Ms. Wishard, but due to their articulated intent to report suspected abuse or neglect. Even though Plaintiffs were purportedly terminated for engaging in restraint, Ms. Wishard

and Jennifer G. admitted that other teachers were not discharged after they had restrained children, including a teacher who pinched a child. Significantly, Ms. Angie was not fired despite the fact that the journal indicated that she actively participated in restraining A.G. on February 7, 2008.[2]

Plaintiffs' evidence also included the following. Jennifer G. was present on December 17, 2007, and observed Plaintiffs restraining A.G. They were not fired then. Jennifer G. was told about an incident occurring on January 11, 2008, when A.G. was restrained. Plaintiffs were not terminated at that time. Plaintiffs specifically told Jennifer G. about the events of February 7, 2008, immediately after they occurred. Plaintiffs were not discharged on February 7, 2008. Likewise, Plaintiffs were not terminated on February 11, 2008, when they gave Ms. Wishard the journal, which documented instances of restraint. Instead, Plaintiffs were fired on February 14, 2008, immediately after they told Ms. Wishard that they were going to file a report that they suspected A.G. was being abused or neglected.

Thus, Plaintiffs' proof was sufficient to establish that the reason for their discharge was their articulation that they, as mandated reporters, were

_____

[2] We note that, for purposes of a summary judgment determination, we are not permitted to credit Ms. Wishard's representation that she did not fire Ms. Angie because she interviewed Ms. Angie and Ms. Angie denied holding down A.G.

going to file a report with the Department of Public Welfare that they suspected that A.G. was being abused or neglected. Child abuse and neglect are matters of great public concern, and are advanced by the requirement that certain persons report suspected abuse. Simply put, if a mandated reporter could be fired for articulating an intent to report suspected abuse, it would have a chilling effect on the very purpose for the statute in question. Plaintiffs' decision to file a report promoted the statute's public policy of protecting children. Plaintiffs have a viable cause of action for wrongful discharge based upon public policy, and they presented sufficient evidence that their discharge was based upon the implicated public policy.

Not only did the trial court ignore the evidence supporting the position that Plaintiffs were terminated for telling Ms. Wishard that they were going to report suspected child abuse or neglect, it also credited the testimonial deposition of Ms. Wishard that Plaintiffs were not fired for that reason. As noted, Ms. Wishard claimed that Plaintiffs were dismissed for violating school policy against restraining children. We concur with Plaintiffs' argument that the grant of summary judgment herein violated the well-ensconced **Nanty-Glo** rule. In **Nanty–Glo v. American Surety Co.**, 163 A. 523, 524 (Pa. 1932), the Supreme Court reversed the entry of a directed verdict, and held that, however "clear and indisputable may be the proof when it depends on oral testimony, it is nevertheless the province of the jury to decide, under instructions from the court, as to the law applicable to the facts."

*Nanty–Glo* is applicable in the summary judgment context, and summary judgment may not be premised upon the acceptance of the testimonial proof offered by the moving party. As our Supreme Court articulated in *Stimmler v. Chestnut Hill Hosp.*, 981 A.2d 145, 154 (Pa. 2009) (quoting Goodrich–Amram 2d § 1035.1, p. 423.), summary judgment serves to avoid "a useless trial but is not, and cannot, be used to provide for trial by affidavits or trial by depositions." The admonition that "trial by testimonial affidavit is prohibited 'cannot be emphasized too strongly.'" *Stimmler*, *supra* at 154 (partially quoting *Curran v. Philadelphia Newspapers, Inc.,* 439 A.2d 652, 662 (Pa. 1981)).

Herein, the trial court claimed that that it was not violating the *Nanty-Glo* rule because the journals, documentary proof, established that Plaintiffs restrained A.G. The trial court's reasoning is misguided. The journal does not set forth why Plaintiffs were fired; it merely proved the fact of restraint. It was Ms. Wishard's deposition testimony that established the purported **reason** that she dismissed Plaintiffs. In short, in granting summary judgment, the court not only ignored the above-delineated proof presented by Plaintiffs, it also credited Ms. Wishard's testimonial assertion that Plaintiffs were terminated due to the fact that they engaged in restraining A.G. The trial court was simply not permitted to accept Ms. Wishard's position on the reason for Plaintiffs' termination due to both the proof presented by Plaintiffs and the application of the *Nanty-Glo* rule.

Defendants do not contest that Plaintiffs stated viable causes of action for wrongful discharge **if** they were fired for stating that they were going to report that they suspected the presence of abuse or neglect in A.G.'s household. Their position is that Plaintiffs were dismissed not as a result of this lawful activity but due to "separate, plausible, and legitimate reasons." Appellees' briefs at 16. They continue that Plaintiffs' terminations "had nothing at all to do with [their] stated intention of reporting [their] suspicions of child abuse," and instead, that they were terminated based on their restraint of a child in violation of school policy. *Id.* Defendants posit that their separate, plausible, and legitimate reason for firing Plaintiffs defeats Plaintiffs' wrongful discharge causes of action. *Id*. at 19. They also parrot the trial court's reasoning that ***Nanty-Glo*** was not violated herein since the journal established the existence of restraint.

We have discredited these positions in our analysis, *supra*. To accept the assertion that Plaintiffs were discharged due to their restraint of A.G., one must credit Ms. Wishard's testimonial evidence presented in her deposition. This is prohibited by the ***Nanty-Glo*** rule. More importantly, to conclude that Ms. Wishard dismissed Plaintiffs based upon restraint, one must discredit Ms. Krolczyk's deposition, wherein she stated that Ms. Wishard told her that the termination was based upon the February 14, 2008 conversation regarding her decision to report. This would also violate the precepts applicable in the summary-judgment context, where one must

accept all the evidence presented by the nonmoving party as true. We thus reject Defendants' arguments.

In conclusion, Plaintiffs adduced sufficient proof to go to the jury on the question of whether they were wrongfully discharged because they were intended, as mandated reporters, to file a report of suspected abuse or neglect in A.G.'s household. The jury must decide whether to credit Ms. Wishard's contrary explanation for Plaintiffs' dismissals. We therefore hold that summary judgment was improperly granted on Plaintiffs' wrongful termination causes of action.

We now address Plaintiffs' position that their defamation causes of action should have survived summary judgment. The elements of a cause of action in defamation are codified in § 8343 of The Uniform Single Publication Act, 42 Pa.C.S. §§ 8341-8345, as follows:

(a) **Burden of plaintiff.--**In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

    (1) The defamatory character of the communication.

    (2) Its publication by the defendant.

    (3) Its application to the plaintiff.

    (4) The understanding by the recipient of its defamatory meaning.

    (5) The understanding by the recipient of it as intended to be applied to the plaintiff.

> (6)    Special harm resulting to the plaintiff from its publication.
>
> (7)    Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343.

Herein, Plaintiffs have conceded that they did not suffer special harm from the publication.   Ms. Krolczyk obtained other employment as an educator, and Ms. DiCola elected to cease working.   Appellants' briefs at 36-37.   However, this statute "does not overrule the long line of cases in our Supreme Court which hold that a slander *per se* is actionable without proof of special damage." ***Walker v. Grand Cent. Sanitation, Inc.***, 634 A.2d 237, 242 (Pa.Super. 1993) (adopting Restatement of Torts as applicable law regarding defamation *per se*).   Under the Restatement (Second) of Torts, defamation *per se* occurs when the statement ascribes to the plaintiff any of the following: commission of a criminal offense, a loathsome disease, serious sexual misconduct, or conduct or characteristics that adversely affect the plaintiff's fitness to properly conduct his profession, trade or business. Restatement (Second) of Torts § 570.[3]   ***See Livingston v. Murray***, 612

_____

[3] That section states:

> One who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other

*(Footnote Continued Next Page)*

A.2d 443 (Pa.Super. 1992) (holding a statement defamatory if it blackens or injures a person in his business or professional reputation).

As we delineated in ***Kurowski v. Burroughs***, 994 A.2d 611, 617 (Pa.Super. 2010) (citations omitted), since the plaintiff has the burden of proving the defamatory character of the communication under the Uniform Single Publication Act, it "is the function of the court to determine whether the challenged publication is capable of a defamatory meaning.  If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." ***Accord Baker v. Lafayette College***, 532 A.2d 399, 402 (Pa. 1987) ("In order for a

*(Footnote Continued)* ————————

> (a)  a criminal offense, as stated in § 571, or
>
> (b)  a loathsome disease, as stated in § 572, or
>
> (c)  matter incompatible with his business, trade, profession, or office, as stated in § 573, or
>
> (d)  serious sexual misconduct, as stated in § 574.

Restatement (Second) of Torts § 570.  These lawsuits implicate § 573, which outlines:

> One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, whether honorary or for profit, is subject to liability without proof of special harm.

Restatement (Second) of Torts § 573.

statement to be considered libelous or slanderous, the trial court must, in the first instance, make a determination as to whether the communication complained of can be construed to have the defamatory meaning ascribed to it by the complaining party.").

In the present case, the letter in question reported to the parents that Plaintiffs were discharged "for various reasons," but Ms. Wishard assured them "that protecting both the children's interest as well as the parents' interest as well as the good of this school are the deciding factors for my decision." Deposition of Jennifer G., 4/13/11, at Exhibit I. The statement accused Plaintiffs of no conduct that would impugn or blacken their professional reputation; it merely reported that they were fired for undisclosed reasons and that the best interests of the children, the parents, and the school were behind the terminations. The letter did not report that Plaintiffs were poor teachers or otherwise suggest that they were not competent professionals. We therefore concur with the trial court that the statements in the letter were not defamatory *per se*.

Plaintiffs counter that the communication that they were terminated for the "good of the children" implicitly impugned their professional reputation. Appellants' briefs at 25-36. Thus, they premise their right to recovery on an innuendo that an action taken for the best interest of the children castigated their teaching abilities. "The question of whether innuendo is actionable as defamatory is a question of law." **ToDay's**

*Housing v. Times Shamrock Communications Inc.*, 21 A.3d 1209, 1215 (Pa.Super. 2011).  When this Court is confronted with a question of law, our standard of review is *de novo* and the scope of review is plenary.  ***Bowling v. Office of Open Records***, 75 A.3d 453 (Pa. 2013).  In order to assess whether the statement is capable of the defamatory meaning imputed to it by a plaintiff, the "court must view the statements in context" to ascertain "the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate."  ***Kurowski***, *supra* at 617.

In this respect, we concur with the trial court that "for the good of the children" did not suggest that Plaintiffs were not capable teachers and did not have the implication that Plaintiffs seek to have us make.  Hence, we affirm its decision to grant summary judgment in favor of Defendants as to the defamation count.

The March 3, 2016 Order is affirmed in part and reversed in part.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/23/2017

- 25 -