2026 PA Super 116

| LIONEL VARGAS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| GREAT VALLEY LANDSCAPING, INC., | : | |
| D/B/A GREAT VALLEY LANDSCAPING | : | |
| POOLS AND RESTORATION ALSO | : | No. 1569 EDA 2025 |
| D/B/A GVLP, AND JOHN AMEN | : | |
| | : | |
| Appellant | : | |

Appeal from the Judgment Entered May 8, 2025
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2024-01336-TT

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and KING, J.

OPINION BY PANELLA, P.J.E.: **FILED JUNE 8, 2026**

Great Valley Landscaping, Inc., D/B/A Great Valley Landscaping Pools and Restoration also D/B/A GVLP, ("Great Valley") and John Amen (collectively "Appellants") appeal from the final judgment entered by the Chester County Court of Common Pleas on May 8, 2025. Appellants challenge the verdict and judgment entered against them and in favor of Lionel Vargas. We affirm.

On February 14, 2024, Vargas filed a complaint against Appellants, including counts for false light and defamation. Appellants filed an answer, largely denying the allegations as pled in the complaint, and new matter, asserting, in pertinent part, that Vargas's defamation claim is barred because he initiated the dispute by voluntarily publicizing his alleged interactions with

Appellants, and that Vargas had portrayed Amen in a false light. Answer and New Matter to Complaint, 5/23/24, at 1-5, 8.

The trial court summarized the factual and procedural history related to the complaint as follows:

[] Vargas, resides in West Chester, Pennsylvania, with [his] wife and two children, ages 6 and 14. [] Vargas engaged Appellants[] to install an inground pool at his home after he had researched various pool companies online. However, the installation was rifted with delays, and technical issues and the project took longer than originally anticipated. The project[] started in January 2023 with permitting and continued until July 28, 2023 when Appellants just stopped showing up. The pool was actually completed in October 2023, but only because Vargas engaged other unrelated contractors to finish the work.

Moreover, [Vargas] had to employ an attorney to cajole Appellants into paying the $14,375.00 for the completion of the project by the unrelated contractors. [Vargas] felt the pool installation was a terrible experience, and he wished that he had read honest reviews about Appellants online before he hired them for the job.

Accordingly, [Vargas] posted a detailed review, explaining what he went through in using Appellants on the website "HomeAdvisor.com" because he wanted to warn the community about his experience. In his online review, [Vargas] was critical of the work that was done and asserted [] Amen[] was "nothing but a liar and a thief."

[] Amen, as president of Great Valley Landscaping, Inc., responded to the public online review on December 19, 2023, stating:

"Leo, [consumer named removed] … He always wore his clothes very tight as if he were a gymnast or a dancer ... The [consumer name removed] had picked some expensive pool decking material ... that was not in the contract. This was over 20k upgrades (sic) for free they wanted. The next payment was due and they did not have the proper funding. I told them I would come back once the finances were straightened out. He wanted to show me the electrical panel

- 2 -

in the basement and then everything at that point took a strange turn. He pulled me into private and asked me some very uncomfortable personal questions and then put his hand on my shoulders and then his other hand on hip (sic) a few times while I was on a ladder reaching up towards the ledger board. At that time I was very steady with my legs and my hips and balance which was only 3' off the ground needed no help. I lashed out that I was fine then he let go. Then I did some more work when I was on the ground and it felt like he was so close he was on top of me. I did what I did that day and grew infuriated and had to leave work early. I only had two days left and the project would be finished. I had to reschedule work to have another one of my guys there the next day but he would always find a way to get me alone and the questions got very bothersome. I began finding a way to not have to confront him on a daily basis but the project was nearing the end with only three days left that I would have to be 100% present. After the last time I was alone with him it was all I could take. I could not be there any more in it (sic) was so humiliating and embarrassing. A few of my guys did not want to work there either but we never discussed anything other that (sic) they has (sic) some creepy moments. I had to exit the job with only 2 more days worth of work. I gave him a reimbursement for $15000 to more than cover the last portion of work that needed to be complete. I m (sic) contemplating fling (sic) but it would be a (sic) battie and would be all over media. He was slick enough to be inappropriate but never on text or when we were area (sic) from security cameras and only while I was along (sic). This was one of the most disturbing and strange experiences in my life and I am in my midlle (sic) 50 s (sic).

In response to the initial review from [] Vargas, Appellants spewed awful lies and innuendos suggesting [Vargas] demonstrated inappropriate and threatening sexual behavior towards Appellants. Appellants also asserted that [] Vargas improperly requested very large discounts on the project, and that he lacked the financial resources to keep the work moving forward.

[Vargas] was shocked when he read the Appellants' response to his review of their work. [] Vargas supplemented his review on December 20th with the additional comment:

"I will gladly share my lawyer's communication with [] Amen to prove all my statements in my review. I'm not surprised by [] Amen's ridiculous and laughable comments, but it is expected from serial liar. Please go visit Yelp customers' review regarding this business and read many more customers sharing the same terrible experience with this business."

Appellants then published the following statement in response to [] Vargas's December 20th comment.

(Response from Company:] "We started Lionel [Consumer Name Removed] pool in W. Chester in April 2023. Everything was on schedule and the pool was completed in July 2023 .... We had to pause on the work for two reasons. They were failing (sic) behind on payments and when I had to work in the basement ... he made me feel very uncomfortable. It was very bizarre and humiliating. He said that I was probably a cute kid when I was little and I became sick to my stomach. Extreme anxiety overcame me and I left immediately. My guys that worked with me knew the situation and they felt the same way. Unfortunately we had to bring in a sub-contractor in the end to finish the work but all work was completed 100% and fully paid for at completion of work. The pool looks absolutely amazing and in the end everything turned out great. In almost 35 years of work this had never happened to me before."

Further, Appellants admitted that the posts were public and at least three people saw them.

Trial Court Opinion, 11/5/25, at 2-5 (record citations and footnotes omitted).

On April 17, 2025, after a trial, a jury found in favor of Vargas and against Appellants for the claims of false light and defamation. For economic damages, the jury awarded $0 for false light, and $200,000 for defamation. The jury also awarded Vargas punitive damages in the amount of $1,000,000 as to Great Valley, and $500,000 as to Amen. Appellants filed post-trial motions for relief, which the trial court denied. On May 8, 2025, Vargas filed

a praecipe for entry of judgment pursuant to Pa.R.C.P. 227.4. That same day,

the court entered a final judgment of $1.7 million against Appellants in favor

of Vargas. This timely appeal followed.

Appellants raise the following issues on appeal:

A. Did [] Vargas fail to carry his burden of proof concerning the Count II Claim for "Defamation," as required by 42 Pa. C.S.[A.] §[]8343(A)?

B. Did [] Vargas fail to present evidence of any economic damage within his case-in-chief that could support the jury award of $200,000.00?

C. Did the trial court abuse its discretion, and an error of law occurred which controlled the outcome of the case, when it rejected [Appellants]' points for charge that included its affirmative defenses as plead within their new matter to [Vargas]'s complaint?

D. Was the jury's award of punitive damages contrary to the established laws of the Commonwealth of Pennsylvania, United States Supreme Court precedent, and did it unconstitutionally deprive [Appellants] of their property, and was so irrational and arbitrary that it rose to a level that it shocks one's sense of justice?

Appellants' Brief, at iv-v (suggested answers and unnecessary capitalization

omitted).

In their first issue, Appellants argue the trial court erred when it refused

to grant a directed verdict on Vargas's defamation claim.[1] *See* Appellants'

_____

[1] Appellants attempt to "expressly reserve" this same argument as to the claim for false light simply by asserting so in a brief footnote. *See* Appellants' Brief, at 13, FN1. This is insufficient to preserve an issue for our review. As the argument actually developed for this issue only pertains to the defamation claim, we find any issue as to false light has been waived. ***See Shannon v.***
*(Footnote Continued Next Page)*

Brief, at 18. Appellants challenge the trial court's failure to enter a directed verdict, based on their claim that Vargas failed to carry his burden of proving he suffered "special harm" pursuant to 42 Pa.C.S.A. § 8343(a)(6). **Id.** Appellants assert this error mandates reversal of the trial court's decision, and request that a directed verdict in favor of Appellants and against Vargas, as to the Count II claim for defamation, be entered. **See id.** Our standard of review, however, does not allow this Court to grant Appellants this relief.

We note that Appellants filed a post-trial motion in which they asserted the same claim regarding Vargas's alleged failure to prove the specific issue of "special harm." Motion for Post-Trial Relief, 4/24/25, at ¶ 5-6. While they did not explicitly use the term, Appellants' post-trial motion was styled as a motion for judgment notwithstanding the verdict ("JNOV"). This appeal follows the trial court's denial of the post-trial motion.

> When reviewing an appeal from the denial of a request for [JNOV], the appellate court must view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. Thus, the grant of [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. It is only when either the movant is entitled to judgment as a matter of law or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant that an appellate court may vacate a jury's finding.

---

**Weis Markets, Inc. Store #173**, 345 A.3d 1204, 1209 (Pa. Super. 2025) ("It is well-settled that undeveloped arguments or those unsupported by citation to relevant authority are waived.") (citations omitted); **see also** Pa.R.A.P. 2119(a), (b).

Our standard of review with respect to the denial of a directed verdict is the same: we may only ask whether the trial court's decision was an abuse of discretion or an error of law that controlled the outcome of the case. The trial judge, however, may only grant a directed verdict motion where the facts are clear and there is no room for doubt. In so determining, the trial court must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony.

*Faherty v. Gracias*, 874 A.2d 1239, 1245-46 (Pa. Super. 2005) (citations and internal quotation marks omitted).

This Court has stated the following with respect to defamation claims:

A publication is defamatory if it is intended to harass the reputation of another so as to lower him or her in the estimation of the community or if it tends to deter third persons from associating or dealing with him or her. When considering defamatory meaning, the court must determine what effect the statement is fairly calculated to produce and the impression it would naturally engender in the minds of average persons among whom it is intended to circulate. A statement which ascribes to another conduct, character, or a condition which would adversely affect her fitness for the proper conduct of her lawful business, trade or profession is defamatory.

*Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 240 (Pa. Super. 1993). To prove a defamation claim, the complaining party has the burden of proving:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) *Special harm resulting to the plaintiff from its publication.*

(7) Abuse of a conditionally privileged occasion.

***Joseph v. Scranton Times L.P.***, 129 A.3d 404, 424 (Pa. 2015) (quoting 42 Pa.C.S.A. § 8343(a)) (emphasis added).

Here, Appellants argue that Vargas failed to carry his burden of proof as to "special harm" pursuant to 42 Pa.C.S.A. § 8343(a)(6). Appellants' Brief, at 14, 18. Specifically, Appellants assert "Vargas offered no testimony, and presented no documentary evidence, to support the existence of any 'special harm,' which he allegedly suffered" as a result of Appellants' posts on the Home Advisor website. ***Id.*** at 14.

The trial court found that the evidence established that Appellants intentionally published false statements to paint Vargas as a sexual deviant who did not pay his bills, and that they did so in order to purposely harm his reputation due to Vargas's honest, but critical, review of Appellants' work. ***See*** Trial Court Opinion, 11/5/25, at 7. The trial court concluded that Appellants committed defamation *per se*, for which Vargas was entitled to damages, by using an online platform to lie about Vargas to lower his standing in the community, in an attempt to justify their failure to timely and appropriately complete work that they were engaged and paid to do. ***See id.***

Importantly, this Court has recognized:

Under the Restatement (Second) of Torts, defamation *per se* occurs when the statement ascribes to the plaintiff any of the following: commission of a criminal offense, a loathsome disease,

serious sexual misconduct, or conduct or characteristics that adversely affect the plaintiff's fitness to properly conduct his profession, trade or business. Restatement (Second) of Torts § 570. *See Livingston v. Murray*, [] 612 A.2d 443 ([Pa. Super.] 1992) (holding a statement defamatory if it blackens or injures a person in his business or professional reputation).

*Krolczyk v. Goddard Systems, Inc.*, 164 A.3d 521, 531 (Pa. Super. 2017).

Appellants rely exclusively on this Court's decision in *Walker*, arguing that the circumstances of that case are analogous here.[2] Specifically, Appellants argue that, similar to *Walker*, the posts here had a limited scope of communication and dissemination, and that Vargas remains "essentially anonymous" because Vargas's full name is not used in the posts and cannot be seen on the Home Advisor website and that Vargas highlighted the lack of harm by his own statement that Appellants posts were "ridiculous and laughable." *Id.* at 15-17. Finally, Appellants assert that, just as in *Walker*, important public policy concerns are implicated here, "where Vargas' case wholly rests upon a 'presumption he was damaged,' but not upon evidence that he was actually damaged." *Id.* at 17.

Importantly, in *Walker*, this Court recognized that Section 8343(a) "does not overrule the long line of cases in our Supreme Court which hold that

---

[2] Despite relying exclusively on the alleged similarities to *Walker*, which dealt with statements that constituted defamation *per* se, Appellants summarily assert that the posts at hand here are "innuendo" communications and not defamation *per se*. *See* Appellants' Brief, at 16. Other than the lack of Vargas's full name in the posts, Appellants provide no discussion or citation to support this assertion. *See id.*

a slander *per se* is actionable without proof of special damage." ***Walker***, 634 A.2d at 242. Accordingly, we stated "firmly that a plaintiff who pleads and proves slander *per se* need not prove special damages in order to recover." ***Id.*** The question left open to address in ***Walker***, was whether a plaintiff in such a case must still prove "general damage." ***Id.***

The ***Walker*** court indicated that United State Supreme Court cases on this subject did not resolve the question of whether damages can be presumed against a private person. ***See id.*** at 242-43 (citing ***Gertz v. Welch***, 418 U.S. 323 (1974) and ***Dun & Bradstreet v. Greenmoss Builders***, 472 U.S. 749 (1985)). Therefore, despite the fact that "[t]he answer to such a fundamental question has proven to be quite elusive under Pennsylvania law," the answer to the question was found to be "purely a matter of state law unaffected by the First Amendment." ***Id.*** at 242-43.

After analyzing this Court's own case law on the subject, the ***Walker*** court adopted the Restatement of Torts as applicable law regarding defamation *per se;* "[n]amely, a defendant who publishes a statement which can be considered slander *per se* is liable for the proven, actual harm the publication causes." We reasoned that

> Requiring the plaintiff to prove general damages in cases of slander *per se* accommodates the plaintiff's interest in recovering for damage to reputation without specifically identifying a pecuniary loss as well as the court's interest in maintaining some type of control over the amount a jury should be entitled to compensate an injured person. On one hand, a slander *per se* plaintiff is relieved of the burden to actually prove pecuniary loss

as the result of the defamation; yet on the other hand, a jury will have some basis upon which to compensate her.

*Id.* at 244.

Notably, in *Walker*, we concluded Walker had failed to provide the jury with any evidence upon which the jury could base an award of damages. *See id.* The defamatory statement was spoken to one person, in order to evaluate Walker and develop a marketing team for a venture that never transpired; that person testified he thought no less of Walker personally and his opinion of her capabilities was unaffected by the defamation; there was no evidence the words were repeated to anyone else or that they had any adverse effect on Walker's job search. *See id.* at 244-45.

Further, and pertinent to the instant matter, Walker did not testify that she suffered any adverse emotional reaction. *See id.* at 245. The Court noted in a footnote, that Walker had presented two witnesses, who testified that Walker was depressed as a result of the statements. *See id.* at 244, FN5. However, the witness' testimony had only been introduced for the purpose of Walker's discrimination claim, outside of the jury's consideration, and therefore that testimony could not be considered for purposes of the defamation claim. *See id.*

As cited above, "[s]pecial harm resulting to the plaintiff" is listed as a statutory element of defamation. 42 Pa.C.S.A. § 8343(a)(6). However, Pennsylvania has also adopted section 569 of the Restatement, which does

not require "special harm" for defamation *per se*. ***See Walker***, 634 A.2d at 244.

> In explaining this "apparent contradiction" between Section 8343 of the statute and Section 569 of the Restatement, the Superior Court [has] reasoned:
>
> The term "special harm" has different meanings in the statute and Restatement. The term "special harm" as used in the statute has been interpreted to mean "general damages" which are proven upon a showing of "actual harm." Actual harm includes impairment of reputation and standing in the community, ... personal humiliation, and mental anguish and suffering.
>
> As used in Section 569 of the Restatement, the "special harm" that a libel plaintiff need not show is actually "special damages." "Special damages" are "economic harm" or "pecuniary loss."

***Joseph***, 129 A.3d at 416 (citation, brackets, and some quotation marks omitted).

Without explaining what "special harm" is, Appellants conclude Vargas failed to show it. Importantly, Appellants specify that Vargas failed to show "special harm" pursuant to the statute. **See** Appellants' Brief, at 18. We find that Appellants are due no relief on this claim.

As explained above, Pennsylvania law does not require "special harm"— defined as economic harm or pecuniary loss—as an element of a defamation claim. ***See Joseph***, 129 A.3d at 416. Pennsylvania merely requires actual harm, which includes personal humiliation, and mental anguish and suffering. ***See id.***; ***see also*** 42 Pa.C.S.A. § 8343(a)(6). The record contains sufficient testimonial evidence of Vargas's personal humiliation, and mental anguish and suffering, including Vargas's testimony that he was "blown away" by the

"bizarre comments about myself … realizing that I was being called a sexual predator." N.T., 4/16/25, at 61. Vargas explained he "was outraged, upset, concerned for my children, my wife, for my work if anybody read this. ... I had great concern about the repercussions of my own children in the neighborhood." *Id.* at 61-62. Vargas testified that he and his wife "were both upset, outraged, shocked. We couldn't believe that someone would post something online to that magnitude. Calling someone a sexual predator …." *Id.* at 67-68. Ms. Vargas similarly testified about being "distressed" and "outraged" at someone calling her husband a pedophile. N.T., 4/17/25, at 70. Accordingly, the trial court did not abuse its discretion in denying Appellants' motions for a directed verdict and for JNOV, as there was plenty of support in the record for a finding of defamation.

In their second issue, incorporating their argument from the first issue above, Appellants argue Vargas failed to present evidence of any economic damage within his case-in-chief that could support the jury award of $200,000. *See* Appellants' Brief, at 18.

We note Appellants' entire argument for this issue is based on one question asked by the jury during deliberations, in which the jury asked: "In monetary terms, relat[ed] to plaintiff + defendant representation, what is the range of average legal fees incurred through similar defamation civil cases of this nature?" Exhibit C-4, 4/17/25.

Appellants admit that, upon receiving the above question, the trial court confirmed the case was closed and that Vargas agreed that legal fees were not entered into evidence. **See** Appellants' Brief, at 19; **see also** N.T., 4/17/25, at 232. Upon bringing the jury back into the courtroom, the court instructed the jury accordingly, stating: "Ladies and gentlemen, in response[,] the [c]ourt can only say this, [Vargas] con[cedes] no legal fees [whatsoever] or expenses were offered into evidence in this case." N.T., 4/17/25, at 233. Despite this clear response to the jury, Appellants argue the jury must have completely ignored the court's instruction, boldly asserting, with no actual explanation, that the award "either took the form of a $200,000.00 award for attorney's fees based upon [the jury's] own guess, or for an unknown economic damage claim that did not appear in the Vargas case-in-chief." Appellant's Brief, at 20.

It is well settled that a jury "is presumed to follow the trial court's instructions." **Commonwealth v. Cash**, 137 A.3d 1262, 1280 (Pa. 2016) (citation omitted). Without any evidence to the contrary, we presume the jury followed the court's direction.

Finally, as made clear above, Vargas was not required to specifically prove economic harm or pecuniary loss based on the conclusion that Appellants' statements constituted defamation *per se*. **See Joseph**, 129 A.3d at 416; **see also Mongell v. Martell**, 1204 WDA 2023, at *5 (Pa. Super. filed November 14, 2024) (unpublished memorandum) ("A plaintiff need not prove

special damages if the statement constitutes defamation *per se*.") (citation omitted).[3] We agree with the trial court that, "the very nature of a defamation *per se* implies an economic hardship will be faced" by the subject of the defamatory comments. Trial Court Opinion, 11/5/25, at 11. Accordingly, we find Appellants' second issue is without merit.

In their third issue, Appellants argue the trial court erred and abused its discretion when it rejected Appellants' points for charge that included their affirmative defenses as plead within their new matter to Vargas' complaint. **See** Appellants' Brief, at 21. While they summarily list multiple requested points for charge, Appellants only develop an argument regarding the language they proposed to add to Pennsylvania Suggested Civil Jury Instruction 17.100. **See id.** at 22.

Pennsylvania Suggested Civil Jury Instruction 17.100 expressly states, in pertinent part: "You should also consider the context in which the allegedly defamatory statement was made." Pa. SSJI (Civ), §17.100 (2024).

Appellants proposed to add the following language to instruction 17.100: "In making this determination, you may consider whether, or not, [] Vargas first published a statement that 'John Amen owner of Great Valley Landscaping and Pool is nothing but a liar and a thief.'" Appellants' Pre-Trial Memorandum, 4/2/25, at 9. Appellants contend this language provided

_____

[3] Pursuant to Pa.R.A.P. 126(b), we may rely on unpublished memorandum issued after May 1, 2019, for their persuasive value.

specific context, showing their pled defense that Vargas solicited the digital confrontation that occurred. **See** Appellant's Brief, at 22-23. The court did not accept the proposed additional language, and instead gave the standard jury instruction.

In Pennsylvania, the standard for reviewing a jury charge is well settled:

> We review a challenge to a jury instruction for an abuse of discretion or an error of law. We must consider the charge as a whole, rather than isolated fragments. We examine the entire instruction against the background of all evidence presented, to determine whether error was committed. A jury charge is erroneous if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse the jury rather than clarify a material issue. Therefore, a charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said. Furthermore, our trial courts are invested with broad discretion in crafting jury instructions, and such instructions will be upheld so long as they clearly and accurately present the law to the jury for its consideration. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

**Commonwealth v. Rush**, 162 A.3d 530, 540 (Pa. Super. 2017) (citations, quotation marks, and brackets omitted).

Appellants rely fully on **Gallo v. Yamaha Motor Corp.**, 526 A.2d 359 (Pa. Super. 1987), for its pronouncement that "instructions of the trial court 'should not exclude any theory, right or defense' that has support in the evidence." Appellants' Brief, at 24 (citing **Gallo**, 526 A.2d at 364).

> Although the court's instructions should not exclude any theory or defense that has support in the evidence, the court may charge only on the law applicable to the factual parameters of a particular case and it may not instruct the jury on inapplicable legal issues.

- 16 -

Consequently, where the record includes no evidence to satisfy the elements of a particular legal doctrine, the court may not discuss that doctrine in its charge.

*Angelo v. Diamontoni*, 871 A.2d 1276, 1279 (Pa. Super. 2005) (citations and quotation marks omitted).

The jury was repeatedly made aware of the context of Vargas's online post to which the Appellants' defamatory statements responded. Vargas fully admitted that he made the initial post, in which he was critical of Appellants' work. *See* N.T., 4/16/25, at 42-45. Vargas's initial statement was entered into the record, *see id*. at 44, read verbatim by Vargas, *see id.* at 46-48, and fully discussed on the record. *See* **id.** at 48-49. Appellants also discussed Vargas's post at length, including during opening and closing statements, to provide the context of the communications. *See id.* at 28; *see also* N.T., 4/17/25, at 80, 123, 164-65, 185. Appellants provide no support for yet another bald claim that "the absence of the exact 'context' [(meaning Vargas's initial post)] within the points for charge, no doubt, meant it was not considered by the jury." Appellants' Brief, at 23. We cannot find any proof in the record that the jury somehow missed, or otherwise disregarded, the numerous mentions and discussions of Vargas's initial post.

In conclusion, the trial court did not err or abuse its discretion by refusing to modify the standard defamation jury charge to provide "context." A review of the record shows that the jury was well aware of the full context of Appellants' defamatory posts, including Vargas's initial post.

In their fourth and final issue, Appellants argue the jury's award of punitive damages, totaling $1,500,000, is erroneous and must be corrected. ***See*** Appellants' Brief, at 26.

We review an award of punitive damages for an abuse of discretion. ***See Grossi v. Travelers Personal Ins. Co.***, 79 A.3d 1141, 1157 (Pa. Super. 2013). "Under Pennsylvania law the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." ***Hollock v. Erie Ins. Exch.***, 842 A.2d 409, 419 (Pa. Super. 2004) (*en banc*) (citation and internal quotation marks omitted); ***see also Grossi***, 79 A.3d at 1157.

> Punitive damages have long been a part of traditional state tort law. The common-law method for assessing punitive damages has been recognized in every state and federal court for over two hundred years—since before enactment of the Fourteenth Amendment in 1868. Punitive damages are aimed at deterrence and retribution. They have been described as "quasi-criminal," and could be described as "private fines" intended to punish the defendant and to deter future wrongdoing. A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation. According to the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.

***Bert Co. v. Turk***, 298 A.3d 44, 58 (Pa. 2023) (citations and some quotation marks omitted). Furthermore,

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier[-]of[-]fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause[,] and the wealth of the defendant.

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 908(2)). "Punitive damages awards must be tailored to each defendant." *Id.* at 71.

In ***BMW of North America, Inc. v. Gore***, 517 U.S. 559 (1996), the United States Supreme Court articulated three "guideposts" for determining if an award of punitive damages is grossly excessive: (1) "the degree of reprehensibility" of the defendant's misconduct; (2) "*the disparity between the* [*actual*] *or potential harm suffered by* [*the plaintiff*] *and* [*the*] *punitive damages award*;" and (3) "the difference between [the punitive damages awarded by the jury] and the civil penalties authorized or imposed in comparable cases." *Id.* at 575 (emphasis added). Appellants focus their argument on the second ***Gore*** guidepost, "the relationship of the punitive verdict to the harm or potential harm suffered by the victim." Appellants' Brief, at 27, 29.

The ***Gore*** rationale was refined in ***State Farm Mut. Auto. Ins. Co. v. Campbell***, 538 U.S. 408 (2003). Pertinently,

in ***State Farm*** the Supreme Court further developed ***Gore's*** second guidepost by adding more structure. In discussing the relationship between a punitive damages award and the harm or potential harm suffered by the victim, the Supreme Court articulated a non-binding single-digit ratio test.

- 19 -

We decline again to impose a bright-line ratio which a punitive damage award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. []

*State Farm*, 538 U.S. at 425[ (citations omitted)]. The *State Farm* Court identified two exceptions to its suggested preference for a single-digit ratio: cases in which "a particularly egregious act has resulted in only a small amount of economic damages," and cases in which "the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine." *State Farm*, 538 U.S. at 425[].

*Bert Co.*, 298 A.3d at 60. In sum,

While the High Court has developed various guideposts and factors to consider in challenges to punitive verdicts based on excessiveness, its instructions are clear on two points: there is no bright line ratio that a punitive damages award cannot exceed; and the guideposts and factors do no operate mechanically because the facts and circumstances of each case are determinative in assessing the constitutionality of a punitive damages award.

*Id.* at 62.

We are unpersuaded by Appellants' claim that the punitive damages award here fails to meet due process standards. While the United States Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," the *State Farm* Court noted that "single-digit multipliers" like the one in the instant case, "are more likely to comport with due process" than multiple-digit multipliers. *Id.* at 424-25. Further, while Appellants argue generally that the punitive damages awarded here were "grossly excessive", they do not actually provide any

discussion or analysis of why the particular amount awarded here was disproportionate to the facts and circumstances.

The trial court here found that "the per-defendant ratio of the punitive damages award is not excessive pursuant to the analysis in **Bert Co.**[]" based on the relationship to the harm *or* potential harm suffered by Vargas. Trial Court Opinion, 11/5/25, at 12. Based on the record, we do not find the trial court abused its discretion in concluding as such. Accordingly, Appellants' final issue is without merit.

As none of Appellants' issues merit any relief, we affirm the judgment.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/8/2026

- 21 -